René P. Voss (CA Bar No. 255758)
Natural Resources Law
15 Alderney Road
San Anselmo, CA  94960
(415) 446-9027 │ renepvoss@gmail.com
LEAD COUNSEL

Oliver J. H. Stiefel (OR Bar No. 135436)
(503) 227-2212 │ oliver@crag.org
Kelly Chang (OR Bar No. 223727)
(503) 234-0788 │ kelly@crag.org
Crag Law Center
3141 E Burnside St,
Portland, OR 97214
LEAD COUNSEL
*Pro Hac Vice*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| KLAMATH FOREST ALLIANCE, EARTH ISLAND INSTITUTE, SEQUOIA FORESTKEEPER, CONSERVATION CONGRESS, AMERICAN WHITEWATER, ENVIRONMENTAL PROTECTION INFORMATION CENTER AND CENTER FOR BIOLOGICAL DIVERSITY, | No.  3:23-cv-03601-RFL |
| | **PLAINTIFFS' RESPONSE TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | |
| v. | Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*) |
| UNITED STATES FOREST SERVICE, | |
| Defendant. | Hearing Date:  April 30, 2024 |
| | Hearing Time:  10:00 a.m, |
| | Courtroom 15, 18th Floor |
| | Before the Hon. Rita F. Lin |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ii

GLOSSARY OF TERMS ............................................................................................... v

I.   INTRODUCTION ................................................................................................ 1

II.  ARGUMENT ....................................................................................................... 1

    A.   The Forest Service Relied on an Unreasonably Narrow Purpose and Need and Failed to Analyze a Reasonable Range of Alternatives. ............................... 1

        1.   The Purpose and Need is Unreasonably Narrow. ................................. 1

        2.   The Agency Failed to Analyze a Reasonable Range of Alternatives. ............ 3

        3.   The Agency Unlawfully Tiered to the Hazard Tree Guidelines. ................. 7

    B.   The Forest Service Failed to Take a "Hard Look" at the Project's Direct, Indirect, and Cumulative Impacts. ................................................................. 9

        1.   The Analysis of Impacts to Wild and Scenic Rivers Was Deficient. ............ 9

        2.   The Analysis of Effects to Imperiled Species Was Deficient. ................... 11

        3.   The Agency Failed to Analyze Cumulative Effects. ............................. 13

    C.   The Forest Service Violated NEPA by Failing to Prepare an EIS ...................... 17

        1.   The Statement of Reasons for Not Preparing an EIS is Arbitrary. ............... 17

        2.   Substantial Questions Exist Over Whether the Project "May" Have Significant Impacts. ................................................................. 18

    D.   Relief ............................................................................................... 19

III. CONCLUSION ................................................................................................... 20

**TABLE OF AUTHORITIES**

**CASES**

*All. for the Wild Rockies v. USFS*, 907 F.3d 1105 (9th Cir. 2018) ................................ 19

*Bark v. USFS*, 958 F.3d 865 (9th Cir. 2020) ....................................................... 16, 19

*Blue Mts. Bio. Proj. v. Blackwood*, 161 F.3d 1208 (9th Cir 1998) ......................... 1, 17

*Bob Marshall All. v. Hodel*, 852 F.2d 1223 (9th Cir. 1988) ...................................... 7

*Cal. ex rel. Lockyer v. USFS*, 465 F. Supp. 2d 942 (N.D. Cal. 2006) ....................... 9

*California v. Block*, 690 F.2d 753 (9th Cir. 1982) ....................................... 3, 4, 15

*Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989 (9th Cir. 2012) .................. 20

*Cascadia Wildlands v. BIA*, 801 F.3d 1105 (9th Cir. 2015) ................................. 14

*Cascadia Wildlands v. BLM*, 410 F. Supp. 3d 1146 (D. Or. 2019) ......................... 11

*Connor v. Burford*, 848 F.2d 1441 (9th Cir. 1988) .............................................. 19

*Ctr. for Bio. Diversity v. BLM*, 746 F. Supp. 2d 1055 (N.D. Cal 2009) .................... 6

*Ctr. for Bio. Diversity v. NHTA*, 538 F.3d 1172 (9th Cir. 2008) ............................. 5

*Ctr. for Bio. Diversity v. Salazar*, 706 F.3d 1085 (9th Cir. 2013) ........................... 1

*Ctr. for Envtl. Health v. Vilsack*, No. 15-cv-01690-JSC, 2016 U.S. Dist. LEXIS
      79984 (N.D. Cal. June 20, 2016) ................................................................. 19

*Ctr. for Envt'l. Law & Policy v. U.S. BOR*, 655 F.3d 1000 (9th Cir. 2011) ................ 17

*City of Carmel-by-the-Sea v. United States DOT*, 123 F3d 1142 (9th Cir. 1997) ........ 16

*City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975) ........................................ 6

*City of Tenakee Springs v. Block*, 778 F.2d 1402 (9th Cir. 1985) ........................... 13

*Curry v. USFS*, 988 F. Supp. 541 (W.D. Pa. 1997) ............................................. 18

*DHX, Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169 (9th Cir. 2005) ....................... 10

*DOT v. Pub. Citizen*, 541 U.S. 752 (2004) ................................................... 19, 20

*Earth Island Institute v. Carlton*, 626 F.3d 462 (9th Cir. 2010) ............................... 9

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 (9th Cir. 2022) ...... 2, 17, 19

*Envtl. Prot. Info. Ctr. v. Carlson*, 968 F.3d 985 (9th Cir. 2020) ................................ 1

*Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F. Supp 2d 1174 (N.D. Cal. 2004) ............... 20

*Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024 (9th Cir. 2008) ................. 4

*Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d 1059 (9th
      Cir. 2004) ................................................................................................. 11

*High Country Conserv. Advocates v. USFS*, 951 F.3d 1217 (10th Cir. 2020) ............... 4

*Humane Soc'y v. Locke*, 626 F.3d 1040 (9th Cir. 2010) ......................................... 19

*Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995) ................................................ 19, 20

*Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002) ............................. 6, 15

*Idaho Sporting Cong. v. Thomas,* 137 F.3d 1146 (9th Cir. 1998) .............................................. 10

*'Ilio'uloakalani Coal. v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006)............................................. 4

*Kern v. BLM*, 284 F.3d 1062 (9th Cir. 2002).............................................................. 1, 8, 9, 13, 17

*Klamath-Siskiyou v. BLM*, 387 F.3d 989 (9th Cir. 2004) ................................................... 15, 16

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) ............................................................ 10

*League of Wilderness Defs. v. USFS*, 689 F.3d 1060 (9th Cir. 2012) .......................................... 3

*League of Wilderness Defs. v. USFS*, No. 3:10-CV-01397-SI, 2012 US Dist.
     LEXIS 190899 (D. Or. Dec. 10, 2012) ............................................................................ 20

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) ......................................................................... 2

*Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988 (9th Cir. 2013) .............................................. 5

*Nat'l Parks & Conserv. Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001) ................................... 17

*Nat'l Parks & Conserv. Ass'n v. BLM*, 606 F.3d 10581 (9th Cir. 2010)....................................... 2

*Native Ecosystems Council v. USFS*, 428 F.3d 1233 (9th Cir. 2005)...................................... 4, 5

*Neighbors of Cuddy Mtn. v. USFS,* 137 F.3d 1372 (9th Cir. 1998)............................................ 13

*N. Plains Res. Council, Inc. v. STB*, 668 F.3d 1067 (9th Cir. 2011)............................... 2, 12, 19

*Northwest Envtl. Def. Ctr. v. BPA*, 117 F.3d 1520 (9th Cir. 1997) ............................................. 5

*NRDC v. USFS*, 421 F.3d 797 (9th Cir. 2005)............................................................................. 4

*Or. Natural Desert Ass'n v. BLM*, 625 F.3d 1092 (9th Cir. 2010) .................................... 3, 7, 18

*Or. Natural Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016) ............................................ 12

*Or. Natural Desert Ass'n v. Rose*, 921 F.3d 1185 (9th Cir. 2019) ....................................... 10, 12

*Or. Natural Desert Ass'n v. Zinke*, 250 F. Supp. 3d 773 (D. Or. 2017) ............................... 19, 20

*Pac. Rivers Council v. USFS*, 689 F.3d 1012, 1031 (9th Cir. 2012) ......................................... 10

*Pollinator Stewardship Council v. EPA*, 806 F.3d 520 (9th Cir. 2015) ..................................... 19

*Protect our Cmtys. Found. v. Lacounte*, 939 F.3d 1029 (9th Cir. 2019) .................................... 13

*Te-Moak Tribe of Western Shoshone v. DOI*, 608 F.3d 592 (9th Cir. 2010)....................... 15, 16

*Tomac v. Norton*, 433 F.3d 852 (9th Cir. 2006) ........................................................................ 18

*USFS v. Pac. Rivers Council*, 570 U.S. 901 (2013).................................................................. 10

*W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013) ........................................... 4, 5

*W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803 (9th Cir. 1980) ....................................................... 20

*Westlands Water Dist. v. Dep't of Interior*, 376 F.3d 853 (9th Cir. 2004) ................................... 2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STATUTES**

Organic Act of 1897

16 U.S.C. § 475 .................................................................................................. 2

Multiple-Use Sustained Yield Act ("MUSYA") of 1960

16 U.S.C. § 528 ............................................................................................... 2, 3

Wild and Scenic Rivers Act (WSRA)

16 U.S.C. § 1281(a) ........................................................................................... 3

Endangered Species Act (ESA)

16 U.S.C. § 1531(a)(1) ....................................................................................... 2

40 C.F.R. § 1501.12 .......................................................................................... 10

40 C.F.R. § 1502.16 ........................................................................................... 5

**REGULATIONS**

Council On Environmental Quality NEPA Regulations

40 C.F.R. § 1501.12 .......................................................................................... 10

40 C.F.R. § 1502.16 ........................................................................................... 5

# GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| AW | American Whitewater |
| BA | Biological Assessment |
| BE | Biological Evaluation |
| BiOp | Biological Opinion |
| CC | Conservation Congress |
| CBD | Center for Biological Diversity |
| CEQ | Council on Environmental Quality |
| Defendant | United States Forest Service |
| DN | Decision Notice |
| EA | Environmental Assessment |
| Effect (or Impact) | Used synonymously to describe ecological, aesthetic, historic, cultural, economic, social, or health consequences of an action, whether direct, indirect, or cumulative. |
| EII | Earth Island Institute |
| EIS | Environmental Impact Statement |
| EPIC | Environmental Protection Information Center |
| ESA | Endangered Species Act |
| FONSI | Finding of No Significant Impact |
| Forest Service | United States Forest Service |
| Hazard Tree Guidelines or Guidelines | Forest Service internal guidelines for identification and mitigation of hazard trees |
| KFA | Klamath Forest Alliance |
| LAA | Likely to Adversely Affect |
| ML | Maintenance Level |
| MUSYA | Multiple Use Sustained Yield Act |
| NF | National Forest |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NLAA | Not Likely to Adversely Affect |
| NSO | Northern Spotted Owl |
| Project | Region 5 Post-Disturbance Hazardous Tree Management Project |
| RCA | Riparian Conservation Area |
| Region 5 or R5 | Pacific Southwest Regional Office of the Forest Service |
| SFK | Sequoia ForestKeeper |
| USFWS | United States Fish and Wildlife Service |
| WSR | Wild and Scenic River |
| WSRA | Wild and Scenic Rivers Act |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.   INTRODUCTION

Defendants wrongly charge that Plaintiffs seek to "hinder" the work of the Forest Service. Defendants' Opening/Response Brief ("Resp.") at 2. Rather, Plaintiffs have not opposed removal of high-priority hazards. *See* Plaintiffs' Opening Brief ("Op.") at 8. But before the agency can embark on its regional-scale Project affecting hundreds of thousands of acres of public forests, it must comply with the law. *Blue Mts. Bio. Proj. v. Blackwood*, 161 F.3d 1208, 1215–16 (9th Cir 1998). NEPA mandates that before approving a site-specific action like the Project—where no further environmental review will occur before implementation—the agency must evaluate alternatives, take a site-specific hard look at environmental impacts, and prepare an EIS if such impacts *may* be significant. *See* Op. at 10–30. Defendants lament that the agency is no longer able to use a NEPA "shortcut" (a Categorical Exclusion ("CE")) for hazard tree work, but that is only because the agency was doing so unlawfully. Resp. at 4. When an agency employs a CE for a project, it need not consider alternatives and take a hard look at impacts. *Ctr. for Bio. Diversity v. Salazar*, 706 F.3d 1085, 1097 (9th Cir. 2013); *Envtl. Prot. Info. Ctr. v. Carlson* ("*EPIC*"), 968 F.3d 985, 988 (9th Cir. 2020). As this Project demonstrates, the agency's response to *EPIC* and its progeny is to simply double down on its hazard tree management. Is there another way to meet basic safety objectives while better protecting sensitive resource values? The Forest Service did not even ask that question. The agency is still refusing to consider any alternatives, uncritically relying on its internal guidelines, and conducting only a coarse-filter analysis of impacts when a fine-filter approach is necessary. The agency's approach is fundamentally inconsistent with NEPA's dual mandate of informed decisionmaking and meaningful public participation. *See Kern v. BLM*, 284 F.3d 1062, 1066–67 (9th Cir. 2002).

# II.   ARGUMENT

## A.   The Forest Service Relied on an Unreasonably Narrow Purpose and Need and Failed to Analyze a Reasonable Range of Alternatives.

### 1.   The Purpose and Need is Unreasonably Narrow.

Defendants argue that the Forest Service was permitted to take into account policy considerations when crafting its purpose and need statement, but that argument misses the

dispositive point. Whatever the agency's policy choice, it may not craft a statement so narrow as to dismiss from detailed consideration every alternative but the proposed action. *See Nat'l Parks & Conserv. Ass'n v. BLM*, 606 F.3d 1058, 1070–71 (9th Cir. 2010).

The record belies Defendants' claim that the "statement is broad enough to allow for alternatives that satisfy the Project's goals." Resp. at 7. Defendants concede that a high volume of alternatives were proposed by commenters, Op. at 12; Resp. at 10 n.5; AR28, 350, 706 ("numerous suggestions … for alternatives to be considered in detail"), but every single one was dismissed as inconsistent with the statement. AR28–30, 350–52, 706–08. The Forest Service unlawfully "preordained" the outcome, using the statement to unduly constrain consideration of any action alternatives other than the agency's preferred approach. *See Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.* ("*EDC*"), 36 F.4th 850, 876 (9th Cir. 2022); *see also Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (NEPA process may not be used as a "subterfuge designed to rationalize a decision already made").[1]

As to the agency's policy choice, Plaintiffs agree that statutory objectives guide the inquiry into the reasonableness of a purpose and need statement. *See* Op. at 12–13. Defendants, however, only selectively cite the governing statutory context. Resp. at 9 (citing limited portions of the Organic Act of 1897 and the Multiple-Use Sustained Yield Act ("MUSYA") of 1960). Those statutes themselves are much broader, and neither demand the prioritization of safety above all else. *Contra Westlands Water Dist. v. Dep't of Interior*, 376 F.3d 853, 867, 871–72 (9th Cir. 2004) (agency had discretion to reject alternative that conflicted with priority in statute).

The Organic Act is not limited to "protection against destruction by fire and depredations." *Compare, e.g.*, Resp. at 9 *with* 16 U.S.C. § 475 ("No public forest reservation shall be established, except to improve and protect the forest within the reservation, or for the purpose of securing favorable conditions of water flows[.]"). And MUSYA, by definition, is a multiple use mandate, directing that national forests are to be "administered for outdoor

---

[1] Whether or not the agency has some limited "flexibility in treatments" at the implementation level, Resp. at 9–10, is irrelevant to the question of whether the purpose and need statement unduly constrained the consideration of alternatives. Whatever choices are made during implementation cannot cure the failure to take a hard look *during the NEPA process*. *Cf. N. Plains Res. Council, Inc. v. STB*, 668 F.3d 1067, 1084–85 (9th Cir. 2011).

recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528.

Moreover, the Forest Service is bound by other statutory authorities, including the ESA and WSRA—as Plaintiffs explained and which Defendants do not contest. Op. at 12. Consideration of alternatives that better promoted conservation of ESA-listed species, 16 U.S.C. § 1531(a)(1), and protected and enhanced wild and scenic river values, *id.* § 1281(a)—while still meeting the agency's basic objectives for the Project—would have been eminently reasonable. *See infra* p. 4. The agency is also bound by the Travel Management Rule, which requires identification of the "minimum road system needed for safe and efficient travel and for administration, utilization, and protection of National Forest System lands." 36 C.F.R. § 212.5(b)(1)—weighing in favor of closing some roads as opposed to conducting hazard tree operations on remote, lightly used backcountry roads not accessing any infrastructure. AR5614; *contra League of Wilderness Defs. v. USFS*, 689 F.3d 1060, 1070 (9th Cir. 2012) (agency was taking action on a specific land allocation governed by a specific statute).[2]

In sum, the guiding statutory context gives the Forest Service ample latitude to account for other resource values, but it used its purpose and need statement to dismiss every alternative other than its preferred approach. This violates NEPA because it impermissibly "end[ed] [the] inquiry at the beginning." *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982).

### 2. The Agency Failed to Analyze a Reasonable Range of Alternatives.

If, on the other hand, the purpose and need statement was not unreasonably narrow, that means it was, *ipso facto*, capacious enough to encompass other alternatives. But rather than consider a "reasonable range" of alternatives, the agency only considered a single action alternative in detail. None of Defendants' three principal defenses are meritorious.

*First*, while in some instances, consideration of a single action alternative may be appropriate, it was unreasonable *here*. Defendants ignore that the "touchstone" for reviewing

---

[2] This Court should not consider Defendants' belated justification for the purpose and need statement in any event. The argument here is an impermissible "post-hoc rationalization advanced ... to defend past agency action against attack." *Or. Natural Desert Ass'n v. BLM* ("*ONDA v. BLM*"), 625 F.3d 1092, 1120 (9th Cir. 2010). None of the EAs or DNs (or response to comments, AR8524–90, or objection responses, AR4607–14, 4967–75, 5341–69) mention the Organic Act or MUSYA at all, let alone as the basis for the consideration of alternatives.

challenges under NEPA is whether the agency's "selection and discussion of alternatives fosters informed decision-making and informed public participation." *Block*, 690 F.2d at 767. Although there is no minimum number of alternatives an agency is required to consider, the focus is on the *substance* of the alternatives. *Native Ecosystems Council v. USFS*, 428 F.3d 1233, 1246 (9th Cir. 2005). For such a massive project, affecting hundreds of thousands of acres across nine national forests, refusing to consider in detail a single alternative to the chosen approach is unprecedented. *Cf. 'Ilio'uloakalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1098 (9th Cir. 2006) ("When the proposed action is an integral part of a coordinated plan to deal with a broad problem, the range of alternatives that must be evaluated is broadened.").

The agency only analyzed taking no action (never seriously considered as an option, AR27–28, 349–50, 705–06) or implementing its proposed action on over 5,700 miles of roads. Op. at 5. Such an "all-or-nothing" approach foreclosed any meaningful review of the important trade-offs implicit in this decision. Indeed, a more tailored approach to ML 2 roads could "reduce adverse impacts of post-disturbance logging on imperiled, threatened, and endangered wildlife species," AR10173, and "protect[] the many other important values in national forests (i.e., ecological integrity, water quality, solitude, etc[.])." AR9521. The agency itself flagged this as a topic of concern for numerous stakeholders. AR1067. Defendants do not explain how the approach of refusing to consider any alternative in detail that addressed this concern accords with NEPA. *See Block*, 690 F.2d at 767 (overturning alternatives analysis that failed to examine relevant trade-offs); *High Country Conserv. Advocates v. USFS*, 951 F.3d 1217, 1224 (10th Cir. 2020) (agency's "one-sided approach conflicts with the agency's obligation under NEPA to provide legitimate consideration to alternatives that fall between the obvious extremes.").

Defendants make light of the "big versus small project" dichotomy, but consideration of a single action alternative in the circumstances of this case is truly unprecedented. *See* Op. at 14; *see also Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038–39 (9th Cir. 2008) (range of alternatives impermissibly narrow); *NRDC v. USFS*, 421 F.3d 797, 814 (9th Cir. 2005) (same). The Forest Service's failure to consider in detail any "mid-range" between 0 and 5,780 miles of roads is fatal to the alternatives analysis. *Cf. Block*, 690 F.2d at 768; *W. Watersheds*

*Project v. Abbey*, 719 F.3d 1035, 1050–51 (9th Cir. 2013); *contra Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1004–05 (9th Cir. 2013) (agency considered a mid-range alternative).

The one case cited by Defendants is inapposite. Resp. at 13 (citing *Northwest Envtl. Def. Ctr. v. BPA*, 117 F.3d 1520 (9th Cir. 1997)). That case does not stand for the blanket proposition that for even large projects, consideration of a single action alternative is per se reasonable. Rather, the court simply held that (1) an alternative proposed by plaintiffs conflicted with the agency's statutory mandate, and (2) that a forthcoming review would study the issue raised by plaintiffs in detail. *Id.* at 1538. Neither of those circumstances is present here.[3]

*Second*, Defendants imply that the agency's cursory consideration of three groups of alternatives somehow backfills the alternatives analysis. Resp. at 10 (agency "went beyond NEPA's requirements"); *id.* at 13 (agency "considered five alternatives"). But a "brief discussion" of other alternatives "does not cure the inadequacies of the other alternatives analyzed in the EA." *Abbey*, 719 F.3d at 1052. Alternatives dismissed from detailed consideration are not evaluated in the "environmental consequences" section of the EA, such that the decisionmaker and public are apprised of the environmental trade-offs of alternative courses of action. 40 C.F.R. § 1502.16; *Ctr. for Bio. Diversity v. NHTA*, 538 F.3d 1172, 1217 (9th Cir. 2008) (agency must give viable alternatives "full and meaningful consideration").

*Third*, Defendants take issue with the proposed alternative involving a more tailored approach to ML 2 roads, but only highlight a problem with the purpose and need statement. If the statement *requires* the agency's chosen hazard tree abatement approach on all 4,250 miles of ML 2 roads, then the statement is unreasonably narrow. *See supra* pp. 1–3. Defendants then undermine their argument by admitting that it *was* reasonable to remove certain ML 2 roads, Resp. at 12 (noting that 25 miles of ML 2 roads were removed on the Lassen National Forest during the administrative objection process), but blame Plaintiffs for not suggesting an alternative with specific ML 2 roads identified. Defendants misunderstand the NEPA burden.

It is black-letter law that "compliance with NEPA is a primary duty of every federal

---

[3] Elsewhere, Defendants cite *Native Ecosystems Council v. U.S. Forest Service*, but as explained, *see* Op. at 14, that case addressed a project involving only 1,500 acres of management activities—a far cry from the over-400,000 acres at issue here. 428 F.3d at 1235.

agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs." *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975). Commenters raised specific factors to guide a more tailored approach to ML 2 roads, *see, e.g.*, AR9521, 10173 (drop treatments on ML 2 roads not essential for accessing recreational sites or private inholdings), but the Forest Service did not engage with this request, merely responding that it was "counterproductive to the agency's core objectives to consider closing important roads[.]" AR30, 352, 708. Instead of requiring the public to inventory over 4,000 miles of roads in two short comment periods, it was the *Forest Service's* duty to explain why every mile of ML 2 road within the fire perimeters is "important," requiring hazard tree abatement, particularly where (1) ML 2 roads are low use and not suitable for passenger cars, AR44946, and (2) the agency ultimately removed certain ML 2 roads, *see* AR8583–88 ("no issue with removal" for some roads)). Indeed, it is the *agency's* duty to consider a reasonable range of alternatives. *See Ctr. for Bio. Diversity v. BLM*, 746 F. Supp. 2d 1055, 1089 (N.D. Cal 2009) (finding it unnecessary to decide whether plaintiff's suggested alternatives should be considered since there was clearly a range of alternatives that would have reduced the OHV route network).

Relatedly, Defendants cite cases discussing the doctrine of administrative exhaustion or waiver. Resp. at 12. But they do not, and cannot claim that Plaintiffs waived their *claim* that the agency failed to consider a reasonable range of alternatives. The Forest Service expressly recognized that commenters during scoping requested alternatives treating fewer roads and avoiding less developed areas and particular areas of concern. AR29–30, 350–51, 707–08. The agency then responded in the draft EA that it would not consider any such alternatives because they were "wholly inconsistent" with the purpose and need. AR236, 582, 958; *see Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965–66 (9th Cir. 2002) (exhaustion satisfied so long as the issues were "raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised"). Where the agency's response had been categorical that it would not consider any alternatives to its proposed action, it strains credulity to demand that commenters should have then come back with more specificity.

Other than flagging the alleged inconsistency with the purpose and need, Defendants fail

to show how a more tailored approach to ML 2 roads was somehow not "viable." An alternative premised on such removal at the Project scale could have better comported with the agency's statutory duties. *See* Op. at 12–13. And, by removing certain roads from the Project, the Forest Service has admitted that not every ML 2 road is "important" or "essential." The NEPA process is the agency's opportunity to address these issues up front; kicking the can down the road to implementation-level decisions about which roads to prioritize for treatments stands the NEPA process on its head. *See* Op. at 13 n.9; AR23, 345, 701 ("Treatments would be prioritized to address the most heavily used roads[.]").[4]

The alternatives analysis is "critical to the goals of NEPA," *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228–29 (9th Cir. 1988), and when acting pursuant to its multiple use mandates, as here, the agency may not "uncritical[ly] privilege one form of use over another[.]" *ONDA v. BLM*, 625 F.3d at 1124. But the Forest Service rejected every single alternative as inconsistent with its predetermined policy choice. This fundamentally conflicts with NEPA.

### 3. The Agency Unlawfully Tiered to the Hazard Tree Guidelines.

Underlying the agency's predetermined, "safety-first" policy choice are the Hazard Tree Guidelines, which largely dictate the scope of the Project. As Plaintiffs explained, which trees constitute "hazards" is not self-evident; the agency relies on the Guidelines for this assessment. Op. at 6–7. Defendants acknowledge: "Forest Service inspectors will evaluate trees within the assessment area to determine whether they are hazards using the [Hazard Tree Guidelines]." Resp. at 6. Despite this admission, Defendants then back away from the Guidelines, attempting to minimize their relevance to the Project. Resp. at 14. This effort is unavailing. Because the Forest Service has "farmed out" the risk assessment to the Guidelines, which have never been subject to their own NEPA analysis, the agency has engaged in unlawful tiering.

Defendants cannot seriously dispute the importance of the Guidelines to the Project—

---

[4] Defendants are dismissive of proposed alternatives not briefed in detail by Plaintiffs, but recognize that this is an "illustrative list." Resp. at 11 n.6. The Forest Service dismissed alternatives not only related to the scope of roads proposed for treatment, including some ML 2 roads, but also the degree of intensity of different treatments on the selected roads and many other suggestions. AR28–30, 351–52, 707–08. This blanket dismissal demonstrates both (1) an unduly narrow purpose and need, and (2) an inadequate range of alternatives.

they provide the singular basis for the agency's assessment of which trees constitute safety hazards. *See, e.g.*, AR20, 342, 698 ("Identify trees for removal that have a genuine risk of falling in the next several years, even if that risk is not a certainty (trees with a "moderate" or "high" risk according to the [Hazard Tree Guidelines])[.]"). The Forest Service dismissed from detailed consideration any alternative that did not comport with its policy choice to abate all trees constituting "hazards" according to the Guidelines. *See* AR24, 346, 702 ("Trees within the assessment areas would be evaluated to determine if they are hazards using the [Hazard Tree Guidelines]. Trees that are determined to be a hazard would be abated[.]"); AR29, 351, 707–08 (rejecting alternatives because they would "result in leaving trees adjacent to roads, trails, and facilities that objectively pose serious hazards *according to the region's hazard tree abatement guidelines*") (emphasis added). In short, the EAs do not actually evaluate the issue of which trees constitute hazards, deferring entirely to the Guidelines. But the Guidelines' protocols for identifying "hazards" have never been subjected to NEPA safeguards.

Defendants do not respond to Plaintiffs' example: a 100-foot tree, 150 feet away from the road. Op. at 7. If this tree is assessed to have a >60% probability of mortality—regardless of other factors—it would score as a "moderate" hazard, and therefore would be felled. AR1699, 1726–40 (criteria for assessing probability of mortality); AR24, 346, 702 (fell trees with >60% probability of mortality); AR1704–05 (a dead tree scores 4 points; any tree with a score ≥4 constitutes a moderate or high hazard). But is it actually a hazard requiring abatement? Do the Guidelines accurately predict probability of mortality? What are the chances this tree will fall across a road? What if it lies along a seldom-travelled ML 2 road?[5] The Guidelines may, or may not, be scientifically sound or constitute wise policy. Whatever the case, "tiering to a document that has not itself been subject to NEPA review is not permitted." *Kern*, 284 F.3d at 1073.

This is analogous to the issue in *Kern*. There, the agency did not analyze the impact of a management plan and certain proposed timber sales on the spread of a fungus that infected the

---

[5] While the Guidelines score for a tree's failure impact is intended to account for factors such as "exposure duration," which is inversely proportional to a road's maintenance level, AR1692, this variable gets erased in the overall score if the tree's failure potential score is 4 (thus qualifying as at least a moderate hazard). AR1699, 1704–05.

Port Orford Cedar tree, and instead, relied on guidelines it had prepared to reduce the spread of the fungus. *Id.* at 1068–69. The court held that, for both the NEPA analysis prepared for the management plan and the proposed timber sales, the agency improperly tiered to the Port Orford Cedar guidelines. *Id.* at 1073–74 ("Although the Guidelines may contain a detailed analysis of the impact on the fungus on the Port Orford Cedar, the BLM is not excused from its responsibility under NEPA to perform an analysis of the effects of the fungus on the Cedar in an EIS specifically addressed to the [plan]."); *accord Cal. ex rel. Lockyer v. USFS*, 465 F. Supp. 2d 942, 950–55 (N.D. Cal. 2006) (holding that the agency's reliance on specific strategies from a fire plan that had never undergone NEPA review constituted improper tiering, in part because the Forest Service failed to independently evaluate alternative fire management strategies).

Defendants attempt to distinguish *Kern* on grounds that the Hazard Tree Guidelines are not a decision document. Resp. at 14. Nor were the guidelines at issue in *Kern*, and, in fact, the Ninth Circuit had earlier rejected a challenge to the guidelines themselves, instead requiring plaintiffs to challenge their application in a NEPA plan analysis and decision. 284 F.3d at 1069. That was the posture of *Kern*, and is the same fact pattern here.[6]

In sum, the agency relied on a front-end policy choice to fell all "hazard" trees but refused to consider any alternatives. But because the agency never actually evaluated which trees constitute a hazard, instead relying entirely on the Guidelines for this assessment, interested stakeholders, scientists, and other agencies have been locked out of that important aspect of the decisionmaking process. This is unlawful tiering.

**B.     The Forest Service Failed to Take a "Hard Look" at the Project's Direct, Indirect, and Cumulative Impacts.**

**1.     The Analysis of Impacts to Wild and Scenic Rivers Was Deficient.**

Defendants' principal rebuttal is that the agency took the requisite hard look at impacts to Wild and Scenic Rivers ("WSRs") not in the EAs, but in other documents in the record. But "the

---

[6] Whether or not the Guidelines themselves are "enforceable," the question at issue in *Earth Island Institute v. Carlton* (a case that says nothing about tiering), is beside the point. 626 F.3d 462, 474 (9th Cir. 2010). Plaintiffs are not trying to "enforce" the Guidelines; they are seeking to ensure that the issue of what constitutes a hazard tree does not forever escape NEPA review.

EA is where the [agency's] defense of its position must be found." *Or. Natural Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019); *see also Pac. Rivers Council v. USFS*, 689 F.3d 1012, 1031 (9th Cir. 2012), *vacated as moot*, 570 U.S. 901 (2013) ("critical part of the analysis" must be in the NEPA document).[7] Defendants lean into "incorporation by reference," but the EAs do not mention that term or cite 40 C.F.R. § 1501.12 (referenced sources must be described and publicly available). In any event, those other sources fail to provide the requisite hard look.

Indeed, contrary to Defendants' assertions, the specialist's report on special management areas provides no actual data or analysis regarding effects to WSR values. Resp. at 16 (citing AR4516–22). That report acknowledges the agency's obligation to "protect their outstandingly remarkable values," AR4521–22, but neither lists nor discusses any of these values for the identified river segments. *Id.*; *contra* AR10156–57 (unique to each segment). Instead, the report simply concludes that "[t]he project will not affect Wild and Scenic River values," but it fails to state what the values are or how it came to that conclusion. AR4516–22. NEPA, however, "requires that the public receive the underlying environmental data from which [an] … expert derived her opinion." *Idaho Sporting Cong. v. Thomas,* 137 F.3d 1146, 1150 (9th Cir. 1998).[8]

Moreover, the report only lists designated WSRs, and makes no mention of any eligible or suitable river segments, contrary to Defendants' assertion. Resp. at 16. For that reason alone, the Forest Service's conclusions in its EAs that "the project[s] will not affect" eligible WSRs are arbitrary and capricious because there is no data or analysis in the record to support that determination. AR71, 395, 757; *see* AR4516–22 (no eligible WSRs in report). Defendants reference tables of "eligible" river segments that overlap road segments, Resp. at 16 (citing AR4457–77), but there is no accompanying analysis of effects on WSR values. And contrary to Defendants' assertion that "[n]o activities occur in segments (either designated or eligible) with a wild classification," *id.*, many of the listed eligible river segments are classified there as "wild." *See* AR4457 (two wild segments on Mendocino); AR4493 (four wild segments on the Plumas); AR4471 (one wild segment on the Sequoia). The specialist report simply ignores or omits these

---

[7] Opinions that have been vacated as moot may still have persuasive value. *See DHX, Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1176 (9th Cir. 2005).
[8] *Overruled on other grounds by Lands Council v. McNair,* 537 F.3d 981 (9th Cir. 2008).

1  eligible WSR segments and values.[9] Accordingly, the special management area report and tables

2  cannot save the EA's deficient "no effect" conclusion because they contain no supporting

3  analysis. Resp. at 17; *see* AR71, 395, 757; *cf. Gifford Pinchot Task Force v. U.S. Fish and*

4  *Wildlife Service*, 378 F.3d 1059, 1074 (9th Cir. 2004) ("The Supreme Court's precedents prohibit

5  us from implying an analysis that is not in the record.").

6        Defendants fall back on the notion that WSR corridors comprise only a small fraction of

7  the Project area. Resp. at 16 n.10. It is not clear how these metrics have any bearing. *Cf.*

8  *Cascadia Wildlands v. BLM*, 410 F. Supp. 3d 1146, 1157 (D. Or. 2019) ("An agency cannot

9  minimize an activity's environmental impact by adopting a broad scale analysis and

10  marginalizing the activity's site-specific impact."). Just because the Project is massive does not

11  mean there will be no site-specific impacts to WSR corridors that have been prioritized for

12  special management protections. The Forest Service had a duty to take a "hard look" at the

13  Project's impacts on the unique aesthetic, scenic, historic, archeological, and scientific values of

14  the 39 designated/eligible WSRs affected by the Project, and its failure to do so violated NEPA.

15        **2.**     **The Analysis of Effects to Imperiled Species Was Deficient.**

16        Neither the EAs, BAs—nor any other source in the record—analyze and disclose the *site-*

17  *specific* impacts of the Project on endangered, threatened, candidate, or sensitive species.

18  Defendants' effort to reduce this claim to a "form over substance" argument thus fails. Resp. at

19  18–19. There are no maps or any other site-specific information providing geographic detail

20  about the location of habitat areas that support critical life cycle functions, such as denning,

21  nesting, and roosting sites and other biologically important areas, and how they would be

22  affected by hazard tree logging operations. All of the analysis is generalized and not spatially

23   

_____

24      [9] Defendants also ignore that the Forest Service identified and Plaintiff American Whitewater
(AW) provided a list of additional "eligible" WSR segments from the Sierra and Sequoia

25  National Forests' Plan revision, which the EA or specialist report also did not list or analyze. *See*
Op. at 18; AR5028, 5060. AW identified five eligible segments on the Sierra and 13 segments on

26  the Sequoia, including one new "wild" segment in the Project area, Freeman Creek. The agency
acknowledged these eligible river segments: "numerous river segments [] have been deemed to

27  be eligible for inclusion into the National Wild and Scenic River System…." AR4970–71 (citing
the "Final [EIS] Revision of the Sequoia and Sierra National Forests Land Management Plans,

28  Appendix C, Table C-1"). But there is no analysis of the Project's effects on these eligible
WSRs, their corridors, or their values anywhere in the record. *See* Op. at 18 n.13.

explicit. *See, e.g.*, AR3522 ("It is expected that there will be some risk to NSO individuals that occupy burnt landscapes for either nesting, roosting or foraging"); *but see Rose*, 921 F.3d at 1191 ("general statements about possible effects and some risk do not constitute a hard look[.]").

For example, the *site-specific* environmental effects to NSO are *not* "adequately identified and evaluated," nor do Plaintiffs concede that the lack of pre-implementation surveys was justified. *Contra* Resp. at 19. The BA may disclose that there are 309 cores/activity centers that overlap with proposed treatment areas, Resp. at 19, but where are they?[10] It was the Fish and Wildlife Service that modeled occupancy of the activity centers, AR11242, and Plaintiffs never had an opportunity to weigh in on site-specific impacts to these or any other areas of concern. *See also* AR3536–37 (disclosing thousands of acres of owl habitat affected, but failing to provide any spatially explicit information); Op. at 21.[11] Rather than conducting any surveys or otherwise analyzing site-specific information, the Forest Service fell back on the project design features to minimize impacts. *See* AR3523. But the Ninth Circuit has expressly rejected such an act-first-mitigate-later approach. *See N. Plains*, 668 F.3d at 1084–85; *Or. Natural Desert Ass'n v. Jewell*, 840 F.3d 562, 570–71 (9th Cir. 2016) (mitigation measures "are not a panacea for inadequate data collection and analysis"); *see also infra* pp. 18–19.

The same is true for ESA-listed amphibians likely to be adversely affected, as well as hundreds of other species across this massive geographic area. Op. at 21–22. Defendants appear to argue that the volume of documents and number of pages is somehow dispositive, *see* Resp. at 20, but entirely absent is any detailed, quantified information about the Project's site-specific effects on any of these species. *See, e.g.*, AR3634, 3641, 3655 (noting that direct effects to frogs "could include" a host of issues but not providing any specific or locational information).

Plaintiffs understand that a detailed analysis—a "hard look"—at the Project's impacts on

---

[10] Plaintiffs mistakenly cited the final fish BA, Op. at 21 n.19; the final wildlife BA is dated either October 2022 (internal date) or December 21, 2022 (AR Index for AR3452), but either is still well after the close of the NEPA commenting period. AR10658–60 (draft EA comments due May 8, 2022). Defendants' admission that the final fish BA was issued after the comment period as well only undermines their "incorporation by reference" argument in any event.

[11] Defendants' characterization that Plaintiff Conservation Congress' objection shows adequate participation in the NEPA process is irreconcilable with the actual content of that objection. *See, e.g.*, AR5484 ("There is no site-specific or local information, no forest-wide information, and no information about recent survey data for any species[.]").

1   so many species is a formidable task. But that is a problem of the Forest Service's own making;

2   once the agency made the choice as to the scale of this Project, it had a duty to analyze and

3   disclose the Project's site-specific impacts on over 400,000 acres and over 5,700 miles of roads

4   across nine national forests. *See Kern*, 284 F.3d at 1072 (analytical scope must be commensurate

5   with the action in question); *City of Tenakee Springs v. Block*, 778 F.2d 1402, 1407 (9th Cir.

6   1985) ("Although the agency does have discretion to define the scope of its actions, such

7   discretion does not allow the agency to determine the specificity required by NEPA."). This is

8   because "a site-specific project," like this one, "demands site-specific analysis." *Protect our*

9   *Cmtys. Found. v. Lacounte*, 939 F.3d 1029, 1039 (9th Cir. 2019).

10       The Forest Service is bound by its choice of project scale and must be held to account for

11   shoehorning the analysis of such an enormous project into three EAs. Because the agency failed

12   to take the requisite site-specific hard look at impacts to imperiled species, it violated NEPA.

13            **3.      The Agency Failed to Analyze Cumulative Effects.**

14       Similarly, Defendants fail to provide the necessary specificity to disclose and analyze

15   cumulative effects. Defendants acknowledge that for a sufficient NEPA analysis "an agency

16   must provide 'some quantified or detailed information' when considering cumulative impacts."

17   Resp. at 20. But Defendants never argue that the Forest Service provided any quantified or

18   detailed information to meet its obligations. *See Neighbors of Cuddy Mtn. v. USFS,* 137 F.3d

19   1372, 1379 (9th Cir. 1998) ("Without such information, neither the courts nor the public, in

20   reviewing the Forest Service's decisions, can be assured that the Forest Service provided the

21   hard look that it is required to provide."). None of Defendants' defenses are meritorious.

22       *First*, Defendants suggest that the requisite analysis is located in the specialist reports,

23   Resp. at 21, but many of the EA's conclusory assertions about cumulative effects provide no

24   references to specialist reports. And where they have included general references, a closer look at

25   the reports reveals no quantitative or detailed information that can assure the public that the

26   Forest Service took the necessary hard look at cumulative effects. *Neighbors,*137 F.3d at 1379.

27       For example, in each Scenery and Recreation section, the EAs abstractly discuss

28   cumulative effects without quantitative or detailed information, and *make no reference to*

---

*specialist reports*. AR69, 393, 752–53. Instead, the only reference is to Appendix C, which simply provides an incomplete list of cumulative actions. This is repeated for Climate Change (AR68, 392, 751), Fuels and Fire Hazards: Ground Fuels & Treatment Corridors (AR66, 389–90, 748–49), Soils and Erosion (AR55–56, 378, 736–37), and other resources.

Where the EAs do reference specialist reports, such as for wildlife, those reports reveal only narrative and fail to provide any necessary quantitative or detailed information, including by failing to mention other projects, individually or in aggregate.[12] For example, as highlighted by Defendants, Resp. at 21, the "Cumulative Effects" section in the EA for the Southern Sierra Zone references the wildlife specialist reports, asserting that "the proposed actions have been analyzed for their potential to result in additive impacts to threatened, endangered, and sensitive wildlife species or their habitats (refer to the cumulative effects sections in the following documents: Wildlife Biological Evaluation [BE], Central Sierra Zone Biological Assessment [BA] and Biological Opinion [BO], the Aquatic Biological Evaluation/Biological Assessment and applicable appendices)." AR368–69 (erroneously referencing the wrong BA and BO). Delving into the cumulative effects section of the Wildlife BE (AR2661–64), however, reveals only narrative that attempts to minimize the potential for cumulative effects, without any quantitative or detailed information. The agency then confirms its misunderstanding of the issue by admitting that "the potential for additive or cumulative effects comes largely from the <u>direct effects</u>… to Forest Service sensitive species…." AR2662 (emphasis in original). It concludes:

> [With] the application of all design features and best management practices, the proposed action, in combination with other planned and ongoing activities and climate change, is not expected to result in, contribute to, or exacerbate, adverse cumulative effects to Forest Service sensitive species or habitats in the analysis area.

AR2664. There is no attempt made to quantify cumulative effects to wildlife, and the BE even admits that "[g]iven the scale of this project and lack of information on non-Federal land, the type and extent of impacts from non-Federal actions are very difficult to quantify." *Id.* Returning

---

[12] *Cascadia Wildlands v. BIA*, 801 F.3d 1105, 1112 (9th Cir. 2015) is inapposite. There, the court explained that considering projects in the aggregate means "incorporating the expected impact of such [other] project[s] into the environmental baseline[.]" *Id.* Defendants present no evidence that current and reasonably foreseeable actions were incorporated into the environmental baseline. In fact, the EAs explicitly describe aggregate actions as *past* actions as applied to current conditions. *See* AR43, 364, 722.

to the EA's Wildlife Section, AR370–71, the Forest Service suggests that "because design features" are used, "no significant cumulative effects to this habitat element are expected." AR371. But the reliance on design features to mitigate cumulative effects from other projects is nonsensical, because the Project's design features cannot control the actions of non-federal projects.[13] *See Te-Moak Tribe of Western Shoshone v. DOI*, 608 F.3d 592, 604–05 (9th Cir. 2010) (EA inadequate because the agency failed to explain how it will mitigate or avoid impacts resulting from other existing, proposed, or reasonably foreseeable projects); *Klamath-Siskiyou v. BLM*, 387 F.3d 989, 995 (9th Cir. 2004) (avoiding cumulative impacts by project design was insufficient because the EAs were silent as to the degree that each factor will be impacted and how the project design will reduce or eliminate the impacts).

*Second*, Defendants wrongly assert that the Forest Service reviewed Plaintiffs' comments and explained how they considered relevant information and input for the cumulative effects analysis. Resp. at 22 (citing AR5344). That record citation simply points to a conclusory response to Plaintiffs' administrative objection for the issue, and contains no detailed analysis.[14] Moreover, the *post hoc* explanation of an urgent need expressed by Defendants to limit the analysis to only "relevant" projects, *id*., does not relieve the agency of the necessary cumulative effects analysis. *See Block*, 778 F.2d at 1407 (agency discretion to define the scope of the action does not allow it to determine the specificity required by NEPA).

*Third*, Plaintiffs were right to point out that the scale of the cumulative impacts analysis for wildlife should consider more than just the narrow 600-foot hazard tree operations corridor and a 0.25-mile buffer around it. A larger scale is needed because limiting the analysis to the small operational corridor only captures the Project's direct effects. *See supra* p. 15 & AR2662

---

[13] Similarly, the BEs referenced in the other EAs, AR47, 727, suffer from the same lack of quantitative or detailed information and repeatedly assert that design features can somehow mitigate cumulative effects. *See* AR2749–52 (Central Sierra Zone BE), 2828–31 (North Zone BE). The BAs only reference non-Federal actions, generically and without any quantitative or detailed analysis of cumulative effects to ESA-listed species. AR3624–75, 3553–63, 3696–3744.

[14] Defendants footnote 14 suggests that Plaintiffs cannot rely on a list of cumulative actions, presented during the administrative objection from a non-party, citing 36 C.F.R § 218.8(c). So long as the issues has been "raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised," there is no waiver. *See Rittenhouse*, 305 F.3d at 965–66. The Forest Service addressed the issue raised by both the non-party and Plaintiff SFK. AR4973.

1   (admission); *Klamath-Siskiyou*, 387 F.3d at 994 (EA's cumulative impact analysis inadequate

2   when it only discusses direct effects); *Te-Moak*, 608 F.3d at 604 (direct effects analysis cannot

3   be used in lieu of cumulative impacts); *Bark v. USFS*, 958 F.3d 865, 872–73 (9th Cir. 2020)

4   (agency arbitrarily limited the scope of its cumulative impacts analysis to the project area plus a

5   1.2-mile area surrounding it, so as to exclude nearby recent or future timber sales, finding that

6   "[s]uch a small buffer zone fails to distinguish the EA's cumulative impact analysis from an

7   analysis of the direct effects of the Project.").

8       The many projects referenced by Plaintiffs in the North Zone outside of the corridor, *see*

9   Op. at 24 (citing AR5609), in combination with the Project would cumulatively impact NSOs.

10  *Id.* Plaintiffs pointed out that the agency only analyzed the limited set of projects they listed in

11  EA Appendix C, ignoring many other cumulative actions. AR5609 (specifically referencing the

12  Antelope-Tennant Fire Recovery, River Complex, Bear Country, and Red Salmon projects on

13  the Klamath; the August Phase 2, McFarland, Trinity River Restoration, and the Digital 299

14  Broadband projects on the Shasta-Trinity; the Hazardous Fuels and Fire Management Project on

15  the Six Rivers; and the Forest-Wide Fire and Fuels Reduction project on the Mendocino—all of

16  which potentially overlap owl activity centers impacted by this Project). This also does not

17  include the "adverse cumulative effects to [NSO] and or their habitat from the reasonably certain

18  work on State, Tribal and private lands," AR3561 (North Zone BA), and "15,287 acres of private

19  lands timber harvest." AR11261 (North Zone BiOp); *see also* AR10440.[15] As Plaintiffs already

20  explained, Defendants did the same for the other listed species of wildlife. Op. at 24–25.

21      By limiting the scope of its cumulative effects analysis and failing to analyze quantitative

22  or detailed information, Defendants violated NEPA by failing to take a hard look. *See Bark*, 958

23  F.3d at 873 (finding that the Forest Service's lack of "quantified or detailed information" and

24  lack of analysis also creates "substantial questions" as to whether the action will have a

25  cumulatively significant environmental impact that would require the preparation of an EIS).

26

27      [15] Plaintiffs cited these comments, Op. at 24, which explicitly referenced the host of projects
    overlooked by the agency. Defendants' attempt to hide behind their arbitrary definition of

28  "relevance," Resp. at 23, fails. *Cf. City of Carmel-by-the-Sea v. United States DOT*, 123 F3d
    1142, 1161 (9th Cir. 1997) (it is the *agency's* duty to consider other projects).

C.   **The Forest Service Violated NEPA by Failing to Prepare an EIS**

1.   **The Statement of Reasons for Not Preparing an EIS is Arbitrary.**

Like the FONSIs themselves, what is most notable about Defendants' brief is what is missing: any serious discussion about the massive size of the Project. Rather than addressing this key issue, Defendants once again attempt to repackage Plaintiffs' claim into a form over substance argument. Resp. at 24–25. This straw man is unavailing. The problem with the FONSIs is that they never address the question of significance at the geographic scale of the Project. Whether or not it was appropriate to cross-reference the EAs as a general matter, the point is that neither the EAs nor the FONSIs actually address whether the authorization of hazard tree operations across 417,000 acres *may* be significant. *Nat'l Parks & Conserv. Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001); *cf. Ctr. for Envt'l. Law & Policy v. U.S. BOR*, 655 F.3d 1000, 1009 (9th Cir. 2011) (agency discussions cannot be "so diffuse, scattered, or opaque that a court must play Humpty Dumpty to put the pieces together in a coherent fashion").

Defendants retreat to the argument that this is not one Project, but nine. Resp. at 25. The record belies that assertion. AR51428. At the very least, the FONSIs themselves address the Project at the regional—not individual forest—scale. AR74 (Central Sierra), AR398 (Southern Sierra), AR761 (North). What is the significance of operations across 131,066 acres, 98,262 acres, and 187,800 acres, respectively? AR11029. The FONSIs are silent as to this question.[16]

Defendants try to further slice and dice the Project, noting the "linear arrangement" of treatment areas "broadly dispersed across the landscape." Resp. at 26. But Plaintiffs have already rebutted these incorrect assumptions. Op. at 27; *EDC*, 36 F.4th at 872 ("agency may not rely on incorrect assumptions or data in arriving at its conclusion of no significant impacts."). Defendants contend that not every tree would be felled within the 600-foot corridor, but admit that "presumptively, *all* fire-killed and fire damaged trees within 300 feet of NFS roads (Levels 2 through 5), trails, and facilities are hazards," Resp. at 14, and the Project authorizes the felling of

---

[16] Any attempt to piecemeal the Project into individual forest decisions also fails. Many key resources, like NSO, Pacific fisher, endangered frogs, and sensitive species, are present in multiple forests; avoiding comprehensive review would risk the "tyranny of small decisions." *Kern*, 284 F.3d at 1078; *Blackwood*, 161 F3d at 1215–16.

all hazards within this area. AR24, 346, 702. Moreover, the Project maps themselves show heavily concentrated operations. Op. at 26–27.

While "there is no categorical rule that sizeable federal undertakings *always* have a significant effect on the quality of the human environment," "[l]arge federal projects may, on the average, be more likely to meet [the significance] threshold." *Tomac v. Norton*, 433 F.3d 852, 862 (9th Cir. 2006); *accord Curry v. USFS*, 988 F. Supp. 541, 551–52 (W.D. Pa. 1997). By failing to address—at all—the massive size of the Project, the FONSIs fail to provide a convincing statement of reasons that the Project's impacts are insignificant.

### 2. Substantial Questions Exist Over Whether the Project "May" Have Significant Impacts.

The Project's FONSIs depend on the successful implementation of a host of project design features and best management practices. AR23, 345, 701 ("use design features to minimize or eliminate potential negative effects"); AR75, 399, 761 ("project-specific design features will be implemented under the proposed action to avoid or minimize adverse effects"); AR85–103, 412–32, 774–95 (list of scores of design features and best management practices). Rather that addressing this argument head on, Defendants mince words and argue that these measures are not "mitigation" per se. Resp. at 27–28. But all of these terms are synonymous, in that their purpose is to lessen the degree of a project's adverse impacts. *See* Forest Service NEPA Handbook 1909.15 Ch. 10, § 14 at 34 (stating that examples of mitigation measures include, *inter alia*, "project design features to avoid or minimize impacts, forest plan requirements, [and] Best Management Practices") (attached as Exhibit 1 to the Second Voss Decl., filed herewith).[17]

Given the stated purpose of the measures—to reduce or eliminate effects—substantial questions arise: if certain measures are not effective, *see, e.g.*, AR5485 (questioning efficacy of wildlife design features because the agency has conducted no pre-implementation surveys); if certain measures are not enforced, *see, e.g.*, AR5483 (EAs do not even address who is responsible for implementing measures); if the Forest Service does not have the resources to implement them at all, *see* Op. at 13 n.9, what are the resultant effects? Defendants assert that

---

[17] This Court may take judicial notice of this record. *ONDA v. BLM*, 625 F.3d at 1112 n.14.

1   efficacy is "discussed throughout the EAs," Resp. at 28, but the cited sources belie that

2   argument. *See, e.g.*, AR63, 385, 744 (conclusory assertions that certain measures would

3   "substantially reduce the overall risk of adverse effects to aquatic species" without any site-

4   specific assessment of efficacy, funding, or enforcement); *see EDC*, 36 F.4th at 879

5   ("Conclusory assertions about insignificant impacts will not suffice.").

6          In sum, extensive mitigation efforts can be important for a project, but they cannot serve

7   as a substitute for an adequate NEPA analysis. *N. Plains*, 668 F.3d at 1084–85; *see also Connor*

8   *v. Burford*, 848 F.2d 1441, 1450–51 (9th Cir. 1988) (EIS required on account of substantial

9   questions about whether mitigation measures for a large-scale project could reduce impacts to

10  insignificance); *Bark*, 958 F.3d at 873 (lack of quantified or detailed information creates

11  substantial questions about whether the action will have a cumulatively significant impact).

12         **D.     Relief**

13         Defendants ignore that vacatur is the "presumptive" remedy in APA cases. Resp. at 28–

14  30 (no discussion of presumption); *contra All. for the Wild Rockies v. USFS*, 907 F.3d 1105,

15  1121–22 (9th Cir. 2018). Defendants also disregard the fact that it is their burden to overcome

16  the presumptive remedy. Resp. at 28–30 (no discussion of burden); *contra Ctr. for Envtl. Health*

17  *v. Vilsack*, No. 15-cv-01690-JSC, 2016 U.S. Dist. LEXIS 79984, at *41 (N.D. Cal. June 20,

18  2016). Finally, Defendants fail to acknowledge that remand without vacatur is to occur only in

19  "rare," "limited circumstances," when "equity demands." *Humane Soc'y v. Locke*, 626 F.3d

20  1040, 1053 n.7 (9th Cir. 2010); *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th

21  Cir. 2015); *Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 1995). It is against

22  this backdrop that the Court weighs the seriousness of the agency's errors against the

23  consequences of vacatur. Op. at 30.

24         Where statutes mandate certain procedures, the failure to follow the requisite procedures

25  amplifies the seriousness of the errors. *See Or. Natural Desert Ass'n v. Zinke*, 250 F. Supp. 3d

26  773, 774 (D. Or. 2017). Defendants are dismissive of the NEPA violations alleged herein, Resp.

27  at 29, but vacatur of an inadequate EA is "the presumptive remedy for agency action that violates

28  NEPA." *EDC*, 36 F.4th at 882. The EIS requirement is the "heart of NEPA," *DOT v. Pub.*

1   *Citizen*, 541 U.S. 752, 757 (2004), and consideration of alternatives is the "heart" of the analysis.

2   *Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F. Supp 2d 1174, 1199 (N.D. Cal. 2004). The violations

3   at issue contravene the very purposes of NEPA. *See Zinke*, 250 F. Supp. 3d at 774. Accordingly,

4   whether or not the agency could "offer better reasoning on remand," Resp. at 29, is of no

5   moment. Permitting the agency to simply rationalize a decision already made cannot be squared

6   with Plaintiffs' NEPA's claims. *See Zinke*, 250 F. Supp. 3d at 774 (remand without vacatur is

7   incongruous with NEPA's dual purpose of informed decision-making and public participation).

8       As to disruptive consequences, the Ninth Circuit has found such consequences "severe"

9   when vacatur would wipe out an entire species of snail, *Idaho Farm Bureau*, 58 F.3d at 1405–06;

10  endanger an entire region's power supply, *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989,

11  994 (9th Cir. 2012); and disrupt the operation of the Clean Air Act in California. *W. Oil & Gas*

12  *Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980). Nothing close to those facts is before this

13  Court. As Plaintiffs have explained, much work to fell imminent hazard trees already has been

14  done. Op. at 4, 8, 13. And, as evidenced by their principal concern over ML 2 roads, Plaintiffs

15  would not oppose additional, tailored operations on ML 3–5 roads on remand.[18] Defendants,

16  however, insist on their "all or nothing approach." But remanding without vacatur on account of

17  Defendants' risk characterizations would mean accepting at face value the agency's unvetted

18  assessment of which trees actually comprise "hazards." *See supra* pp. 7–9; AR6757–63. At the

19  very least, no such deference is due at the remedy stage. *See League of Wilderness Defs. v.*

20  *USFS*, No. 3:10-CV-01397-SI, 2012 US Dist. LEXIS 190899, at 9–10 (D. Or. Dec. 10, 2012).[19]

21  **III.   CONCLUSION**

22      For all of the foregoing reasons, Plaintiffs respectfully ask this Court to grant their

23  Motion for Summary Judgment, hold unlawful and set aside the EAs, FONSIs, and DNs, and

24  remand to the Forest Service to comply with NEPA.

---

25  [18] Plaintiffs have also been clear about their acquiescence for "essential" or "critical" ML 2

26  roads, because of access to important infrastructure. Op. at 12; Resp. at 30. A substantial fraction of ML 2 roads, by definition, do not fall into this category. AR44946.

27  [19] Defendants cite 43 damage claims over the last ten years across all of Region 5, which comprises over 20 million acres and is visited by millions of people each year. *See*

28  https://www.fs.usda.gov/main/r5/about-region. Placed in this context, these numbers are miniscule, and importantly, they are just claims, not findings of liability.

Respectfully submitted this 14th day of March, 2024.

*/s/ René Voss*
René Voss

*/s/ Oliver Stiefel*
Oliver J.H. Stiefel, *Pro Hac Vice*
Kelly Chang, *Pro Hac Vice*
*Attorneys for Plaintiffs*